UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE

CIVIL ACTION NO. 7:03-CV-379

BILLY JOE ESTEP,                                                      PLAINTIFF

v.                                   **OPINION & ORDER**

CONTINENTAL CASUALTY COMPANY                                DEFENDANT

* * * * * * * * * * *

This matter is before the Court on the parties' cross-motions for judgment. Plaintiff Billy

Joe Estep's Renewed Motion for Judgment is filed at R. 22. Defendant Continental Casualty

Company's Renewed Motion for Judgment is filed at Record No. 24. The Court has carefully

considered the memoranda filed in support of each motion [R. 15, 19].

**I. BACKGROUND**

Plaintiff Billy Joe Estep has asserted a claim under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against the Defendant Continental

Casualty Company ("Continental Casualty") for wrongful denial of disability benefits. Plaintiff

was an employee of Ferrell Companies, Inc. ("Ferrellgas") from November 25, 1990, until his

last day of work on September 21, 2000. During that time, Plaintiff was a driver/salesman, the

requirements of which including driving, lifting and various types of maintenance work. As part

of his employee benefits package, Plaintiff participated in a long-term disability insurance plan

("the Plan") offered by Ferrellgas through a policy of insurance issued to Ferrellgas by

Continental Casualty, policy number SR-83096129. Plaintiff states that he paid for his

-1-

participation in the Plan.  Both parties agree that the Plan is an "employee benefit welfare plan"

subject to regulation under ERISA.  See 29 U.S.C. § 1002(1).

### ***The Disability Plan***

The Plan provides, "if You are Disabled, You are eligible to receive one of the following

at any given time: a Monthly Benefit, a Work Incentive Benefit or an Enhanced Work Incentive

Benefit."  (Policy, p. 009).

The Plan defines "Disabled" or "Disability" as follows:

"Disability" means that during the Elimination Period [180 days] and the
following 24 months, Injury or Sickness causes physical or mental impairment to
such a degree of severity that You are:
1.     continuously unable to perform the Material and Substantial Duties
       of Your Regular Occupation; and
2.     not working for wages in any occupation for which You are or
       become qualified by education, training or experience.

After the Monthly Benefit has been payable for 24 months, "Disability" means
that Injury or Sickness causes physical or mental impairment to such a degree of
severity that You are:
1.     continuously unable to perform the Material and Substantial Duties
       of any occupation for which You are or become qualified by
       education, training, or experience; and
2.     not working for wages in any occupation for which You are or
       become qualified by education, training or experience.

(Policy, p. 008)

The Plan further states that it "does not cover any loss caused by, contributed to, or

resulting from . . . Disability beyond 24 months after the Elimination Period if it is due to a

Mental Disorder of any type." (Policy, p. 013).  Under the provision entitled "What Are The

Claim Filing Requirements?", the Plan set forth as follows:

Proof of Disability
The following items, supplied at Your expense, must be part of Your proof of

-2-

loss.  Failure to do so may delay, suspend or terminate Your benefits:

* * *

5.      Objective medical findings which support Your Disability.   Objective
        medical findings include but are not limited to tests, procedures, or clinical
        examinations standardly accepted in the practice of medicine, for Your
        disabling condition(s).

6.      The extent of Your Disability, including restrictions and limitations which
        are preventing You from performing Your Regular Occupation.

(Policy, p. 016)

The Plan also states, "When making a benefit determination under the policy, We

[Continental Casualty] have discretionary authority to determine Your eligibility for benefits and

to interpret the terms and provisions of the policy."  (Policy, p. 006).

## Plaintiff's Claim and Initial Receipt of Benefits

On or about April 6, 2001, Plaintiff filed a claim for benefits with Continental Casualty

for review.  Plaintiff states that he was injured while on working for Ferrellgas on September 18,

2000.  Plaintiff states that while he was loading a propane tank weighing approximately 1500

pounds into the back of a boom truck, the tank began to shift back towards him.  (The equipment

that moved the tank forward once it was lifted above truck bed level had failed.)  In order the

stop the tank, Plaintiff shoved with his hands and arms against the tank and at the time felt a

"catch" and heard a "pop" in his neck.  When relating the story to treating neurologist Sujata R.

Gutti, M.D., a few days later, Plaintiff said that at the time of the injury he also felt a sudden pain

in his neck with sharp pain in his right arm and numbness in the right arm.

Plaintiff finished his shift on September 18th and attempted to work the 19th.  Plaintiff

sought medical care on September 21, 2000, at the Pikeville Methodist Hospital Emergency

Room.  A neck x-ray showed mild degenerative disc disease at C4-C5.  He was prescribed

injections of Tradol and Valium and discharged with prescriptions for Motrin and Flexoril and

referred to a doctor.

Over the course of the next few months, the plaintiff saw a number of primary care doctors, specialists and physical therapists, and began a series of treatments and therapy. The list of care providers visited and the various forms of treatment detailed by both parties in their briefs to the court and rather than repeat the list here, the court will assume familiarity with those visits.

For purposes of this litigation, the relevant events began on March 30, 2001, when Estep applied for benefits pursuant to the policy at issue. On July 6, 2001, Continental Casualty approved the request for benefits for the period between March 25, 2001 until July 14, 2001, which represented the 180 day elimination period from the date of the injury. However Continental Casualty also advised that the benefits would cease at the end of that period, claiming that the information supported a finding that Estep should be able to return to work by July 14, 2001.

Soon thereafter, Estep's attorney wrote to Continental Casualty requesting reconsideration and enclosing the newest medical records supporting his condition. On January 16, 2002, Continental Casualty reconsidered its position and decided to grant benefits to Estep through January 15, 2002. It also advised Estep that it would be re-evaluating his condition and would be in contact with medical officials in order to determine whether to continue future payments. After undertaking such an evaluation, Continental Casualty informed Estep on March 12, 2002, that it would continue to extend him the benefits of the policy "as long as Mr. Estep continues to meet the definition of disability as per his policy." (Adm. Rec. 293).

Estep continued to receive his benefits for the next year and no change occurred in the plan until January 21, 2003. On that day, Continental Casualty wrote to Estep's attorney stating

-4-

that, "the medical and vocational documentation in your file does not support that you are unable to perform alternative employment on a full time basis either due to a physical or mental nervous condition." (Adm. Rec. 205). Specifically, Continental Casualty claimed that there was no evidence that he could not perform "any" occupation, a requirement under the plan after the initial 24 months of benefit payments. The letter went on to inform Estep that his benefits would be discontinued as of March 24, 2003 and that he had a right to appeal.

On February 27, 2003, Estep requested an appeal of the decision to deny benefits and enclosed submitted evidence for review. Continental Casualty's vocational case manager denied reconsideration, stating that there was evidence that Estep was able to have some level of activity and that he was capable of performing some alternative occupations. His case was forwarded to the Appeals Committee, and on April 23, 2003, and a final denial was given, thus ending the appeals process. Estep then filed suit in state court on November 13, 2003, and Continental Casualty removed the action to federal court. It is this claim we now review.

## II. ANALYSIS

When evaluating a plan administrator's denial of ERISA benefits, this court's standard of review is *de novo*. *Wilkins v. Baptist Regional Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998). However, when a plan administrator is granted discretionary authority by the explicit terms of the plan to determine eligibility for benefits, our standard of review is limited to simply determining whether the decision is arbitrary and capricious. *Yeger v. Reliance Standard Life Insurance Co.*, 88 f.3d 376 (6th Cir. 1996). The policy at issue in this case is clear in determining where interpretive and decision-making authority lies. The policy states, "when making a benefit determination under the policy, we (Continental Casualty) have discretionary authority to

determine your (Estep's) eligibility for benefits and to interpret the terms and provisions of the policy." (Adm. Rec. 6). Thus this Court's review is limited to whether there is a rational basis for the decision made by the system administrator and whether there is adequate evidence in the record to support the conclusion. *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Here this standard is sufficiently met.

In order to establish benefits after the initial payment period under the Plan, Estep was required to prove that his condition rendered him unable to perform "any occupation." (Adm. Rec. 8). Beginning in 2001, Estep was treated by Dr. Sujata Gutti, who was the first medical doctor to look into Estep's injury. Dr. Gutti diagnosed Estep with "cervical radiculopathy" and determined him to have injuries that would lead to restrictions on his ability to lift or reach overhead. (Adm. Rec. 148-149). Dr. Gutti thus recommended that Estep only undertake light or sedentary work. (Adm. Rec. 170).

Soon thereafter, Estep visited Pain Management Specialist Dr. Sai Gutti, who noted that Estep had a significant amount of pain. (Adm. Rec. 287). Dr. Sai Gutti also recommended that Estep only perform jobs that required small amounts of heavy lifting and that he be restricted to work of only a "light duty." (Adm. Rec. 183). Both Dr. Sujata Gutti and Dr. Sai Gutti thus found that while Estep had an injury to his back that would involve some limitation to his ability to perform work that required heavy lifting, there were jobs that only required light duty or sedentary skills that he could perform.

Others who examined Estep found even less restriction on his ability to work. Dr. Bart Goldman described his injury as akin to the classic notion of a football "stinger" and found that "he should be involved in a physical therapy and work hardening program . . . and then, return to

-6-

essentially regular-duty work." (Adm. Rec. 414). Dr. David Weinswieg viewed an MRI and concluded that it showed an injury that was "not overly dramatic" and recommended physical therapy as the correct treatment. (Adm. Rec. 448). After examining Mr. Estep, Dr. Harry Bell came to a similar conclusion, determining that he was "unable to explain the degree or perpetuation of Mr. Estep's complaints on the basis of identifiable underlying pathology." (Adm. Rec. 498). He then performed a Functional Capacity Evaluation on Estep and concluded that he would be able to undertake a "medium physical demand level."

All of these determinations by medical professionals support the conclusion that, while there was some degree of impairment due to Estep's injuries, he was not incapacitated and could still function in a job requiring light to medium physical activity. This conclusion was bolstered by the determination of the Vocational Case Manager assigned to Estep's claim, Bob Cirnigliaro. Mr. Cirnigliaro reviewed the various medical opinions and concluded that Estep had the functional ability to perform a variety of alternative occupations. (Adm. Rec. 208). The recommendation included occupations that could be performed on a full-time sedentary basis and those that included very limited lifting. After this initial assessment, Mr. Cirnigliaro conducted a follow-up review and came to a similar conclusion, finding no deterioration in ability in the intervening months. (Adm. Rec. 201). When combined with the opinion of the various medical professionals who examined Estep, Mr. Cirnigliaro's conclusion is supported by the evidence in the record and can in no way be deemed "arbitrary or capricious."

Estep challenges Mr. Cirnigliaro's findings by asserting that they were not based on the evidence, but simply were made to reach the desired conclusion, mainly that Estep was not impaired. However he bases this conclusion solely on the fact that the letter Mr. Cirnigiliaro sent

to Estep's employer was dated January 13, 2003, a full seven days before Cirnigliaro even conducted the vocational assessment. However, an overall review of the administrative record reveals that the letter was simply a misdated by Mr. Cirnigliaro. The letter references earlier correspondence between the two parties, which was dated January 21, 2003. In addition, the evidence shows that the file was not even referred for vocational assessment until January 16, 2003. When viewed in light of these facts, the court finds that it is more likely that the letter expressing Mr. Cirnigliaro's conclusion was simply mis-dated rather than proof of fraudulent behavior.

Estep also claims that Continental Casualty's decision to deny benefits ignored his substantial evidence of mental impairment. Contrary to Estep's assertion, the majority of the evidence in the record suggests that Estep is not mentally impaired to the point that would affect his job capabilities. Psychiatrist Dr. J.R. Geete performed a psychiatric evaluation on Estep and determined that while Estep had "anxious preoccupation with panic attacks," there is no evidence of any significant neurological or other systemic side effects due to current psychotropic medications." (Adm. Rec. 301, 349). Thus Geete found no reason that any of Estep's psychological problems would render him incapable of performing sedentary or light occupations. However, even if such mental conditions existed, it would be of no help to Estep due to the language of his Plan. The plan states that it "does not cover any loss caused by, contributed to, or resulting from . . . disability beyond 24 months after the elimination period if it is due to a mental disorder of any type." (Adm. Rec. 13). Thus even if we assume that Dr. Geete's conclusion was incorrect and that Estep had a mental condition, such assumptions would do nothing to bolster Estep's claim to benefits under the Plan.

Finally, Estep claims that the fact that he was granted disability benefits by the Social Security Administration should control the question of whether he has a disability under the Plan. (Adm. Rec. 233-234). While such findings by the Social Security Administration are evidence of disability, they are not controlling on ERISA determinations. The Sixth Circuit affirmed this principle in an unpublished opinion, holding that claims administrators of disability insurance plans are not bound by Social Security determinations. *Fuller v. Retirement Plan for Salaried Employees of Brown & Williamson Tobacco Corp. and Certain Affiliates*, 1997 WL 10952 (6th Cir. 1997). While an unpublished opinion is not precedential on this court, its reasoning is persuasive. Because there is nothing about the Social Security decision included in this administrative record, we have no way of evaluating its reasoning or understanding what considerations were used to form the basis of the decision. In addition, what little evidence we have suggests that Estep's mental condition at the time of his filing played at least some role in the Social Security determination. (Adm. Rec. 234). As shown earlier, mental conditions are not relevant under the Plan. Thus, the Social Security Administration's determination should be given little evidentiary weight.

Despite Estep's assertions to the contrary, the sole question for this court is if Continental Casualty's denial of benefits was arbitrary and capricious. In order to be eligible for continued benefits after the original 24 months under the Plan, Estep was required to submit proof that his condition made him unable to perform "any occupation." Estep had the burden of showing, with specific medical evidence, that there was no occupation in which he could reasonably be expected to perform. Estep has given little evidence suggesting that he cannot perform "any occupation," and the vast majority of the evidence suggests the opposite conclusion, mainly that

he is able to perform sedentary or light to medium level work.  When considering the totality of the medical observations and the assessment of the vocational case manager, it becomes clear to this court that the Plan's Administrator's decision is supported by substantial evidence in the record and cannot be characterized as "arbitrary and capricious."

### III. CONCLUSION

For the foregoing reasons, Estep's Renewed Motion for Judgment (R. 22) is DENIED; Continental Casualty's Renewed Motion for Judgment is GRANTED; and this matter is hereby DISMISSED with prejudice.

Dated the 30th day of November, 2005.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**